On the Merits.
PRO YO STY, J.
The following instrument is self-explanatory •-
“This agreement made and entered into this 20th day of November, 190G, by and between
“(1) A. Kory & Sons a commercial and manufacturing firm of the city of New Orleans composed of Abraham Kory, Edward Kory and Max Kory,
“(2) Clarence E. Kory, Eugene Kory and Roscoe Kory,
“(3) Newburger and Levy represented by E. Levy, all designated hereafter as parties of the first part, and Silvan Newburger, party of the second part,
“ Witnesseth:
“That whereas the firm of A. Kory & Sons is unable to meet its obligation and desires to offer in settlement of same the sum of 50% in cash, which amount they find it necessary to borrow from Silvan Newburger, now, therefore:
“In consideration of the agreement on the part of Silvan Newburger to advance the amount necessary to make the said settlement aggregating to a total of said firm, to be sold, collected or otherwise administered by him for the purpose of reimbursing himself for the said amount to be advanced as aforesaid. The said A. Kory & Sons and the individual members of said firm, hereby agree to vest the absolute and unrestricted administration of said property in the said Silvan Newburger to be disposed of in such a manner and for such price and on such conditions as, in his own judgment may deem best, said A. Kory & .Sons binding themselves not to revoke this authority which is based upon an adequate, consideration nor to interfere in any manner in the said administration.
“They the said A. Kory & Sons further agree to sign all papers, documents, transfers and checks and- to make any and all endorsements that may be necessary to make this agreement effective and to sign and execute Powers of Attorneys authorizing the said Silvan Newburger to dispose of all the real estate belonging to the said firm or the individual members thereof in the city of New Orleans and should they fail to execute a separate power of attorney they agree that this instrument shall constitute and have full force and effect of a power of attorney and be sufficient for said purpose.
“The said A. Kory & Sons further agree to sign checks upon such funds of theirs as may be-in banks, in favor of the said Silvan New-burger when requested by him to do so, in order to enable him to utilize the said funds in carrying out the above-stated object. '
“The above-named Edward Kory and Max Kory furthermore agree to give their assistance, employing their whole time if necessary, to enable the said Silvan Newburger to administer the said assets and estate above described, collect outstanding accounts and to dispose of all the assets to the best possible advantage, their compensation to be fixed and paid by said Silvan Newburger as aforesaid, the said Silvan Newburger to have the right to dispense with their services whenever, in his opinion, no longqv nsedcd.
“The firm of A. Kory & Sons and the said Eugene Kory, Clarence Kory and Roscoe Kory, hereby promise and agree that they will hold the said Silvan Newburger harmless for any negligent act in the premises as well as for any of all errors of judgment or acts of omission in the premises, hereby expressly waiving and abandoning in advance, any claims that might accrue to them on account of such acts or omissions.
“The said A. Kory & Sons and the individual members thereof, Clarence Kory, Eugene Kory and Roscoe Kory and the said Newburger and. Levy, hereby agree to postpone any and all claims that they might have against the assets of the said firm or the individual members thereof as owners or creditors until the aforesaid sum of $56,700 or whatever sum shall be required to pay the debts, together with expenses and charges, are reimbursed to the said Silvan Newburger.
“It is agreed that said Silvan Newburger shall have the right to pay out of the proceeds the charges, costs, attorney’s fees and expenses of administration, clerk hire, and the like.
“In witness thereof the parties have hereunto-signed their names in duplicate in this city of New Orleans on this twenty-sixth day of November, 1906.
“A. Kory & Sons.
“Edward Kory.
“Max A. Kory.
“A. Kory.
“Eugene Kory.
“Clarence Kory.
“Roscoe Kory.
“Silvan Newburger.
“Newburger & Levy, per L. Levy»
“Witness;
“Bernard Titche.
“Bertrand I. Cahn.”
*825 For the execution of the trust with which he was charged by this instrument Newburger, by consent of all parties, associated with himself Mr. Sol. Wexler.
Among the creditors of A. Kory & Sons were the Whitney-Central National Bank, Newburger & Levy, and Eugene, Clarence and Roscoe Kory. On the same day on which said instrument was executed, the creditors here named and the liquidators Newburger and Wexler entered into a contract, to which A. Kory & Sons, as a firm and individually, were parties, by which said creditors agreed to postpone their claims until all the other creditors of A. Kory & Sons had been settled with; and, in order to facilitate said settlement, the bank agreed to advance $56,700, to he repaid out of the first proceeds realized from the assets of A. Kory & Sons, and all the parties agreed as to how the other proceeds should be apportioned after the said $56,700 should have been refunded.
A. Kory had furnished the entire capital of A. Kory & Sons, to wit, $50,000.
The premises in which A. Kory & Sons carried on its business had been acquired by an act reciting that the property was sold
—“unto Messrs. A. Kory & Sons, a firm domiciled and doing business in this city, composed of Messrs. Abraham Kory, Max. A. Kory and Edward Kory, herein purchasing * * * in the proportion of an undivided one-third each.”
When, in the execution of their said trust of liquidating the affairs of A. Kory & Sons, Newburger and Wexler caused the said real estate to be advertised for sale at public auction, Edward Kory objected, and served notice upon them that he revoked the power of attorney given them to sell his property. He at the same time made an effort, through his counsel, to have them agree to postpone the sale, or, at any rate, to fix an upset price of $25,000 upon the property. He claims that a positive assurance was given him that the sale would not take place.
The property was adjudicated to one Flonaker. Flonaker was purchasing for the plaintiff company; but his authority to do so had not been given by formal resolution by the plaintiff company’s board of directors.
On the day after the auction sale, but before the adjudication could be consummated by the execution and registry of a deed of sale, Edward Kory placed a mortgage upon his undivided third of said property for $7,-500 represented by notes to the order of himself, and by him indorsed in blank. The mortgage purported to have been given to one Ducros; but Ducros was a mere nominal mortgagee, and there was no real mortgagee.
A few days later the plaintiff company by a formal resolution of its board of directors ratified the purchase made by Flonaker for its account; and was given possession of the property by the liquidators. It then brought the present suit nominally for specific performance of the auction sale, but in reality for the annulment of the mortgage executed by Edward Kory.
The grounds of the latter demand are that said mortgage is a simulation, and, if not a simulation, has been executed in fraud of the rights of the plaintiff company. The liquidators, Wexler & Newburger, the auctioneer, the partnership, and the members thereof, and the said nominal mortgagee were made parties defendant.
The said nominal mortgagee appeared, and disclaimed all interest. The other defendants, except Edward Kory, expressed their perfect willingness to comply with the demand of plaintiff. Edward Kory, after the general denial, answered as follows: That, before the said auction, he had revoked the power of attorney to Newburger, and that, moreover, the said power of attorney had been vacated by all the debts of A. Kory & Sons having been paid out of the assets of the firm theretofore sold; that the said auction sale was made in violation of an agreement between the liquidators ahd himself *827 that it should not take place; finally, that the liquidators had no authority to make said sale through an auctioneer.
While this suit was pending in one of the divisions of the civil district court, the mortgage notes matured, and executory process was instituted on them, in another of the divisions of the court, by I-Iartwig Moss as holder and owner of them. The plaintiff: company intervened in this executory process suit, and enjoined the executory process on the same grounds of simulation and fraud which it had theretofore alleged against the same mortgage in the specific performance suit.
This intervention was filed on August 28, 1908. Three days thereafter, on September 1, 1908, the plaintiff company filed a supplemental petition in the specific performance suit, asking that Ilartwig Moss he made a party defendant to that part of the suit wherein the mortgage was sought to be annulled on the grounds of simulation and fraud.
To the said supplemental petition I-Iartwig Moss filed exceptions of lis pendens and misjoinder of parties and of causes of action; and on the same day he filed his answer to the intervention of the plaintiff company, in the executory process-injunction suit.
In this answer, which was filed on October 14, 1908, after pleading no cause of action and the general denial, he averred that immediately after their execution the mortgage notes were pledged to him by Edward Kory “to secure him in advances and indorsements made to Edward Kory to the amount of $5,-000,” and that he accepted said pledge on a clear certificate of the records of the mortgage office that Edward Kory had not alienated the mortgaged property.
The same issues of the simulated and fraudulent character of the mortgage being thus involved in the two suits, the plaintiff company took a rule in the executory process-injunction suit on Ilartwig Moss and Edward Kory to show cause why that suit should not be transferred to the division of the court wherein the specific performance suit • was pending, “to be there cumulated and consolidated” with said other suit. Moss and Kory accepted service of this rule; and, so far as the record shows, made no defense thereto. In due course the rule was made absolute.
On November 20, 1908, the plaintiff company filed in the court in which the specific performance suit was pending and to which the executory process-injunction suit had been transferred an ex parte motion for the consolidation of the two suits, and the motion was granted.
The exceptions to the filing of the supplemental petition having been on December 2, 1908, overruled, I-Iartwig Moss on December 8, 1908, filed his answer — merely a general denial.
'When the consolidated cases came on for trial, Ilartwig Moss and Edward Kory objected to the consolidation, and reserved a bill to the overruling of the objection.
The ruling thus made is the first matter coming up for discussion.
The only provision of our Code of Practice bearing upon the consolidation of suits is article 422, which reads:
“When parties have instituted against each other several suits, either as principal or incidental demands, before the same tribunal, the court may, at the request of one of the parties, order that the same be consolidated, if from their nature they may be compensated, in order that they may be all decided by one single judgment.”
The learned counsel for Ilartwig Moss contends that, except under the circumstances specified in this article, suits cannot be ordered to be consolidated.
We do not agree with that view. Every reason would dictate that two suits before the same court between the same parties and involving the same issues should be consoli *829 dated. If the Code has not made any express provision to that effect, it is simply because such a provision was unnecessary. The above quoted article authorizes the consolidation of suits involving different issues. If so, a fortiori, does it authorize the consolidation of suits involving the same issue.
Hartwig Moss complains for the first time in his brief in this court of the transfer which was made of the executory process-injunction suit. Needless to say such complaint comes too late. The time to have made it was when he was ruled to show cause why the transfer should not be made. No cause was shown then. It is too late to attempt to show it now.
As all the issues which are sought to be raised by the supplemental petition filed in the specific performance suit are also raised in the executory process-injunction suit which is held to have been properly consolidated with the specific performance suit, the exceptions or lis pendens, and misjoinder of parties and of causes of action interposed to tire filing of said supplemental petition become functus officio; since whether or not said exceptions are sustained or overruled, and whether or not the said supplemental petition is sustained or dismissed, the issues in the case continue to be exactly the same.
Coming to Edward Kory’s defenses to the specific performance suit, we have no hesitation whatever in pronouncing them without merit. In addition to those set forth in the answer, it is contended in his behalf that the firm assets had to be exhausted before the individual property of the partners could be resorted to, and that, in the absence of a formal resolution of the board of directors of the plaintiff company authorizing Flonaker to bid at the auction for the plaintiff company, the latter was without authority to bind the plaintiff company by his bidding at said auction and that consequently there was no sale; and in the latter connection the decision of this court in the case of Jackson Brewing Company v. Canton, 118 La. 823, 43 South. 454, is invoked.
The legal propositions here advanced are above criticism, but have no application to the case. The power of attorney authorized Newburger to dispose of this individual property of the partners, and the evidence shows that there was pressing reason for selling this real estate. So far as concerns the auction sale not having been binding 'on the plaintiff company, of course, it was not until it had been ratified by a formal resolution of the plaintiff company’s board of directors. And, equally of course, Newburger and Wexler, the liquidators, were not bound by the auction sale, and might have receded from it when advised of the ratification of it by the plaintiff company’s board of directors. But very far from desiring to recede from it, they, on the contrary, confirmed it, and are now asking that it he consummated.
Edward Kory’s revocation of the power of attorney to Newburger and Wexler amounted to naught, since the said power of attorney formed an essential part of a contract, and therefore was not revocable at his will, and since, moreover, the contract entered into by the Whitney bank and others on the same day and to which Edward Kory was a party was based upon it. This power of attorney having invested Newburger and Wexler with, full, unlimited, and unqualified power to sell the real estate of the partners as in his judgment might seem best for the speedy settlement of the affairs of the firm, the contention that they could not make the sale through an auctioneer is manifestly without merit. Through an auctioneer was the proper mode for them to make the sale. All the debts of A. Kory & Sons had not been paid; in fact, there was pressing reason for selling the property.
Far from finding as a fact that the liquidators agreed that the auction sale should *831 not take place, we find, on the contrary, that there was an express refusal on their- part .to enter into any further agreement with Edward Kory in the premises. What took place between the parties in that connection .amounted to nothing more than the courtesy that was due to defendant’s learned counsel.
As concerns the pretended mortgage of Hartwig Moss, we have had no difficulty in reaching the conclusion that it is a pure ¡simulation. For some reason or other, Edward Kory had become hostile to the arrangement by which Newburger had been given complete control of the affairs of A. Kory & Sons and of the property of said firm and of the members thereof. He was, -or pretended to be, under the impression that the true condition of the accounts was being kept from him. He had demanded $5,-000, which he insisted was his share of the ¡surplus of the assets of A. Kory & Sons over liabilities. He was threatening not to allow the auction sale to rake place unless the liquidators would agree to pay him one third -of what would remain of the price of the «ale after there had been paid out of it a certain mortgage debt due on the property. The day after the auction sale, but before it ■could be consummated by the execution and registry of a deed, Edward Kory hurriedly placed this simulated mortgage on his one •third, and, as if to leave no room for doubt as <to what was the true nature of the act, his counsel wrote to the liquidators on the ■day after its execution as follows:
“I regret that circumstances prevented you from receiving my letter in time to stop the ■sale. As it is, my client at once advised me to stop the consummation of the sale, and I have done so.”
The attempt on the part of Hartwig Moss to show that the notes were transferred to him to secure indorsements for Edward Kory is too transparent, and lets in daylight through too many flaws and cracks to serve any purpose. He is the father-in-law of Edward Kory, and was as familiar as Edward Kory himself with every circumstance connected with the whole matter.
Judgment affirmed.